NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0294n.06

No. 12-2363

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RANDLE GRIFFIN, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Apr 21, 2014 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| MARY K. BERGHUIS, Warden; MARK | ) | UNITED STATES DISTRICT |
| SUTHERBY, Assistant Deputy Warden; | ) | COURT FOR THE EASTERN |
| CONDON, RUM; DOWNARD, Corrections | ) | DISTRICT OF MICHIGAN |
| Officer; McMURTRIE, Corrections Officer, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE: MERRITT, SUTTON, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Michigan state prisoner Randle Griffin appeals the entry of summary judgment in favor of defendants in this 42 U.S.C. § 1983 civil rights action, which asserts two sets of First Amendment retaliation claims against prison officials at two different prisons. The first set of plaintiff Griffin's claims alleges that he was removed from participation in the Warden's Forum—an elected inmate body that liaised with prison officials about inmate interests—and transferred to a different facility after he wrote a letter to the warden's regional supervisor. Plaintiff's second batch of claims asserts that defendant officers conspired to—and did—file at least one false misconduct charge against him in retaliation for his participation as a witness in an investigation into the treatment of a fellow prisoner. The magistrate judge recommended

entering summary judgment in favor of defendants on all of plaintiff's claims. The district court agreed and entered judgment accordingly.

We affirm the entry of judgment against plaintiff's first set of claims, but reverse the entry of judgment regarding his second set of claims. The claims related to Griffin's letter fail because his letter-writing was not protected by the First Amendment: defendant prison officials asserted that plaintiff's letter jeopardized prison security, and the record supports this assertion. Regarding Griffin's second group of claims, the defendant officers concede that he engaged in protected conduct and suffered an adverse action, and their argument that plaintiff failed to demonstrate causation amounts only to a request that this court disbelieve the evidence that he has corralled. Because factual disputes precluded entry of summary judgment against plaintiff's claims related to his receipt of a false misconduct charge, we reverse and remand regarding these claims.

I.

Griffin was elected in late July 2010 as an inmate representative to the Warden's Forum at Earnest C. Brooks Correctional Facility, where he was then imprisoned. Comprised of inmates elected to serve as representatives of the prison population, the Warden's Forum is a feature of Michigan prisons that is intended "to assist the Warden in identifying and resolving problems which exist in the general population of the institution." *See* Michigan Department of Corrections ("MDOC") Policy Directive No. 04.01.150, ¶ L (March 5, 2007). Because the purpose of the Warden's Forum is to facilitate the resolution of inmate complaints about "matters of concern to the general prisoner population," elected representatives may not "use their position to present individual complaints to the administration" but must instead pursue individual grievances "through the grievance process" established by other MDOC regulations.

*Id.* at ¶¶ K, L, O. Representatives who misuse their position on the Warden's Forum by threatening disorder are subject to removal: "Housing unit representatives serve solely in an advisory capacity to the administration and shall in no way jeopardize the custody, security, or good order of the institution. A housing unit representative who abuses his/her position by creating a serious threat to the custody, security or good order of the institution may be removed and/or permanently prohibited from serving as a housing unit representative." *Id.* at ¶ B.

Almost immediately after he was elected to the Warden's Forum, Griffin and two other newly-elected representatives wrote letters to the regional prison administrator, expressing their concern that they might suffer retaliation in the future due to their participation in the Warden's Forum. Griffin's letter was as follows:

> Dear RPA:
> A newly elected Warden Forum is taking office and many fear retaliation for redressing legitimate complaints, e.g. retaliatory transfers e[tc].
> We have a very committed Forum and intend on diligently challenging issues of concern to the population, staying within the boundaries of PD-04-01-150. Our job [is] to represent the prisoner population regardless if Administrative Staff might want certain issues addressed.
> Collectively, we are asking that the situation be monitored closely. It is not up to MDOC Staff to conclude what they think is best for the prisoner population, e.g., the curr[e]nt cable contract, improper ventilation in the housing units, food quality, etc. We desire change and plan on achieving such through diligent and professional redress.
> No LRF Representative should be retaliated against.

Griffin sent copies of his letter to several other individuals, including Warden Berghuis and his fellow Warden's Forum members.

The first meeting of the newly-elected Forum occurred on August 10, 2010, when Assistant Deputy Warden Mark Sutherby met with the new representatives. At that meeting, Griffin and his two fellow lettersmiths were elected to key committee positions on the Forum, including its chairmanship. And they were uncannily prepared for their new positions:

immediately after their election, Griffin and his fellow committee members presented Sutherby with an agenda that had been prepared prior to the meeting. Sutherby was not enthused by the fact that the newly-elected leadership presented him with an agenda that had been prepared before the meeting took place and before they had been selected to head the Forum, but the Forum members "gave support" to their new leaders and ultimately received Sutherby's permission to submit their agenda items to the warden, Mary Berghuis.

Three days after the meeting, Sutherby began preparing transfer orders for Griffin and the two other inmates who had written to the regional prison administrator. On August 17, Griffin received a letter from Warden Berghuis informing him that he had been removed from the Warden's Forum. According to Berghuis' letter, Griffin's participation on the Forum was ended

> because your behavior as a member of the Warden's Forum has jeopardized the good order of the facility. You, along with other Forum members, sent an inappropriate memo to the Regional Prison Administrator that demeans the character of staff and was clearly an attempt at an organized protest on various issues that have been repeatedly covered by previous Warden's Forum members in an appropriate fashion.

Griffin's fellow letter-writers were transferred only days after the Forum meeting. Griffin, who was subject to a medical hold, was transferred to Gus Harrison Correctional Facility in September 2010 and claims that, due to his transfer, he lost his relatively well-paying prison job and his family had difficulty visiting him.

At Gus Harrison, Griffin was again elected to the Warden's Forum. In February 2011, Griffin served as a witness against Officer Condon in an investigation opened by the Legislative Ombudsman into whether Condon had assaulted another prisoner. According to Griffin, Condon told him on March 2, 2011, that Griffin's "statement to the Ombudsman will not change a thing, and would only come back to bite [Griffin] in the Ass!" Immediately thereafter, asserts Griffin,

Condon conspired with two other officers—Officers Downard and McMurtrie—to lodge false misconduct tickets against Griffin, knowing that he would be removed from his position on the Warden's Forum as a result. Two other inmates claim that they heard the three officers exclaiming that "they were tired of Griffin trying to change things" and agreeing that they would falsely write him up for misconduct so that he would be removed from the Warden's Forum.

Later that day, Officer Downard wrote Griffin a misconduct ticket, which was eventually upheld on review. The following day, claims Griffin, Officer McMurtrie told him not to report to his work assignment but then wrote him an out-of-place misconduct ticket for failing to report to work. When Griffin appealed the misconduct ticket, his appeal was upheld and the ticket was dismissed.

Proceeding pro se, Griffin filed this § 1983 action, alleging that defendants Berghuis, Sutherby, Condon, Downard, and McMurtrie retaliated against him because he exercised his First Amendment rights. Defendants moved for summary judgment. Berghuis and Sutherby claimed that plaintiff was transferred "because he was attempting to organize a protest with several other prisoners." In their view, Griffin's "attempt to bypass the forum's chain of command and to organize a protest at that meeting is sufficient grounds for plaintiff's removal from the Warden's Forum and to be transferred away from the prisoners he was attempting to organize." McMurtrie, for his part, claims that he was "unaware" that Griffin was not required to report for work on the day that he wrote the out-of-place misconduct ticket.

The magistrate judge recommended granting defendants' summary judgment motion, and the district court agreed. Griffin appealed, and we thereafter appointed counsel to represent him.

II.

A summary judgment determination is reviewed de novo. *See Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Premature entry of summary judgment supplants the role of a fact-finder in adjudicating the issue of liability. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Denial of summary judgment where there is no genuine dispute of material fact, on the other hand, improperly permits a claim to go to the fact-finder, despite the fact that there can be only one possible outcome. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson*, 477 U.S. at 250–52. In determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson*, 477 U.S. at 251–52, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Shreve v. Franklin Cnty.*, 743 F.3d 126, 132 (6th Cir. 2014).

A.

A First Amendment retaliation claim "entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

1.

Plaintiff's claims against Berghuis and Sutherby fail on the first element because his letter was not protected by the First Amendment. Griffin does not identify which portion of the First Amendment he relies upon, seeming to argue that his letter was protected under both the

Free Speech Clause and the Petition Clause. But in the end, it does not matter, because the same legal test applies in either circumstance: his letter is unprotected if its prohibition by prison officials is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see Thaddeus-X*, 175 F.3d at 395 ("[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct.'" (internal citation omitted)).

Griffin cannot sidestep this rule by citing free speech cases that acknowledge prisoners' rights to communicate with individuals external to prison administration. *See Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (discussing the viability of *Procunier v. Martinez*, 416 U.S. 396 (1974)); *Bell-Bey v. Williams*, 87 F.3d 832, 838 n.7 (6th Cir. 1996). These cases are clearly inapposite. Griffin's letter was not addressed to a recipient external to prison administration; it was written to Warden Berghuis' direct supervisor at MDOC, asking that the warden's behavior be "monitored." Copies of the letter, moreover, were sent to Warden Berghuis and the other inmate members of the Warden's Forum.

Because it was routed to fellow inmates, Griffin's missive could be regulated as inter-inmate communication. *See Turner*, 482 U.S. at 91–93 (upholding prohibition of inter-inmate correspondence). It is, in any event, an entirely internal communication. As a result, the increased scrutiny applied to restrictions on inmates' outgoing mail to external parties do not apply in this case. *See Thornburgh*, 490 U.S. at 412. Instead, to the extent that Griffin invokes the Free Speech Clause, the general rule—that a prison inmate's speech is not protected by the First Amendment if it is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system"—governs his claims. *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *see also Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (prisoner's

-7-

free speech rights outweighed by prison's penological interest in punishing inmate insolence to prison authorities).

To the extent that Griffin relies upon the Petition Clause, the analysis is not materially different. The Petition Clause guarantees the right to "petition the Government for a redress of grievances." U.S. Const. amend. I; *see Thaddeus-X*, 175 F.3d at 391; *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). Claiming that "[a]n inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf," Griffin argues that his letter is protected by the First Amendment because it amounts to a grievance. *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (internal quotation marks omitted).

This characterization is problematic. Members of the Warden's Forum are explicitly barred from using the Forum as a substitute for the formal grievance process. *See* MDOC Policy Directive No. 04.01.150 ¶ K. A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only "one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials" while leaving a formal grievance procedure intact. *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977). Because there is no suggestion in the record that either Griffin or the prior Forum representatives could not have complied with the appropriate formal grievance process, it is unclear that Griffin's letter falls within the aegis of the Petition Clause or is potentially protected by the First Amendment for any reason other than that it constitutes speech.

But even if Griffin's letter does implicate the Petition Clause, his case is not exempt from application of the general rule that taking an adverse action against a prisoner "is permissible where it serves a legitimate penological interest." *Ward v. Dyke*, 58 F.3d 271, 275 (6th Cir. 1995). In other words, while it is clearly improper for a prisoner to be "subjected to discipline

merely because he complained" about his treatment by prison officials, a prisoner's right to assert grievances is not unqualified. *Wolfel v. Bates*, 707 F.2d 932, 934 (6th Cir. 1983). Even though "a prisoner may have a right to file grievances against prison officials, he or she cannot exercise that right in a manner that violates legitimate prison regulations or penological objectives." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). "Abusive or manipulative use of a grievance system [is] not . . . protected conduct," and prison officials may take action in response to the prisoner's improper use of the grievance process as long as the response aligns with a legitimate penological goal. *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 985 (2013). *See also Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 864 (5th Cir. 2004) (to succeed on a First Amendment retaliation claim, a prisoner must establish that he exercised his rights "in a manner consistent with his status as a prisoner").

In *Smith*, for example, we concluded that a prisoner had not demonstrated a First Amendment retaliation claim where he had been terminated from his position as an inmate legal advisor "because of his aggressive attitudes in the discharge of his job duties [in assisting inmates in disciplinary hearings] and his attempts to intimidate staff members." 250 F.3d at 1037. Similarly, we ruled in *Ward* that a prisoner could legitimately be transferred in order "to give prison staff a respite from his continuous barrage of grievances" because by doing so, prison administrators "were able to maintain the peaceful management of the prison by reducing the tension between the staff and Ward without discouraging him from seeking redress of his grievances." 58 F.3d at 274. As we observed, "[t]he ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management." *Id*.

This principle—that the First Amendment does not protect a prisoner's complaint about prison conditions if it is made in a manner incompatible with the institution's legitimate penological objectives—is fatal to Griffin's claims against Berghuis and Sutherby. *See Pell*, 417 U.S. at 822; *Thaddeus-X*, 175 F.3d at 395. Griffin correctly observes that "[p]risons have an interest in keeping the inmates as safe and secure as possible while imprisoned, and truthful speech that describes possible abuses can actually be quite consistent with that objective." *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009). But Griffin's insistence in this respect misses the point. A prisoner's First Amendment rights "may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that [the exercise of those rights] possess[es] the likelihood of disruption to prison order or stability, or otherwise interfere[s] with the legitimate penological objectives of the prison environment." *Jones*, 433 U.S. at 132. Berghuis and Sutherby claimed that Griffin's letter posed a threat to prison security and consequently interfered with the prison's legitimate penological objectives. Their invocation of security interests parallels the provisions of MDOC Policy Directive No. 04.01.150, which provides that Forum members "shall in no way jeopardize the custody, security, or good order of the institution." *Id.* at ¶ B. It therefore appears that Griffin's letter, which posed a disruptive threat to the security of the prison, is not protected by either the Free Speech or Petition clauses of the First Amendment. *See Thaddeus-X*, 175 F.3d at 395.

The only way that this could not be true is if the action that Berghuis and Sutherby took in response to Griffin's letter was unreasonable or unrelated to legitimate penological objectives. But Griffin makes no attempt to churn through the *Turner* factors to demonstrate that this is so. *See Turner*, 482 U.S. at 89–91 (noting that a prison policy is reasonable if (1) it is rationally connected to a legitimate governmental interest, (2) there are readily available alternative means

for the prisoner to exercise his rights, (3) the prisoner cannot be accommodated without burdening fellow inmates or the prison's resources, and (4) there are no obvious alternatives available to the prison that would accommodate the prisoner's conduct at a de minimus cost to legitimate penological interests).

The closest Griffin comes to making an argument under *Turner* is an assertion that his letter was so innocuous that Berghuis' and Sutherby's reaction to it was unreasonable. *Id.* at 90. But because maintaining prison calm and order clearly is a legitimate penological objective, Griffin's First Amendment claims fail unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response" to the perceived security concerns posed by his conduct. *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (citation omitted); *see Turner*, 482 U.S. at 90.

This standard is not easily met. "[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482–83 (1995) (internal citations omitted). "In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like." *Hewitt v. Helms*, 459 U.S. 460, 474 (1983), *limited on other grounds by Sandin*, 515 U.S. at 483–84. "In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct . . . The judgment of prison officials in this context . . . turns largely on purely subjective evaluations and on predictions of future behavior." *Id.* (internal quotation marks omitted). Because "prison administrators . . . , and not the courts, are

to make the difficult judgments concerning institutional operations," *Turner*, 482 U.S. at 89 (internal quotations, alteration, and citation omitted), courts afford prison officials "wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547; *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) ("Courts generally afford great deference to prison policies, regulations, and practices relating to the preservation of [security] interests.").

Griffin is, of course, correct that deference has its limits. While "[p]rison officials are clearly free to punish inmate conduct that threatens the orderly administration of the prison," prison rules may not be "used as a backdoor means of punishing inmates for exercising their right to criticize the legality of officials' actions." *Brown v. Crowley*, 312 F.3d 782, 791 (6th Cir. 2002). Rote invocation of security interests, regardless of how tenuous the potential security threat may actually be, may not be permitted to shield prison officials from liability for impermissible retaliation. *See Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010).

But nothing in the record suggests that this is what happened here. Contrary to Griffin's arguments, his letter provides some support for Berghuis' and Sutherby's assertion that it presented a security concern. Portions of Griffin's missive could be read as a warning to the regional prison administrator that Griffin and likeminded inmates were about to bring matters with the administration to a head. Although Griffin claimed that his conduct would "stay[]" within the boundaries of" Policy Directive 04.01.150, his letter simultaneously flouted the Policy Directive's provision that inmate representatives "serve solely in an advisory capacity to the administration," *id.* at ¶ B, by contending that "[i]t is not up to MDOC Staff to conclude what they think is best for the prisoner population." In short, Berghuis and Sutherby were not

unreasonable in asserting that Griffin's letter—copies of which were sent to all other members of the Warden's Forum—evidences Griffin's and his fellow representatives' intent to pit themselves against the administration in a manner that would disrupt the legitimate objectives of the institution. *See Jones*, 433 U.S. at 132 (prisoners' associational rights "must give way to the reasonable considerations of penal management"); *Lockett*, 526 F.3d at 874 (disparaging a guard was not protected conduct because it violated an MDOC regulation prohibiting insolence).

And even if Griffin's letter was not the most provocative use of the written word, Berghuis and Sutherby received it against the background of collective inmate action: Griffin and two other inmates had each written such letters, had each been elected to key positions in the newly-constituted Warden's Forum, and had evidently planned a unified agenda well in advance, as they were able to present it to Berghuis and Sutherby immediately upon their election to the Forum's critical leadership positions. It was well within reason for Berghuis and Sutherby to suspect that Griffin and his compatriots had jointly schemed to take control of Forum leadership in order to press a collective and disruptive agenda upon prison officials, and it was likewise reasonable for them to believe that Griffin's letter, which was disseminated to his fellow Forum representatives, itself contributed to the precarious prison situation.

Nor was it improper for prison officials to stymie the inmates' group effort at such a nascent stage. This court has recognized "the general need of corrections officers to maintain order in a prison, which may require acting preemptively based on concerns that have not yet materialized." *King*, 680 F.3d at 700. "The informed discretion of prison officials that there is potential danger may be sufficient for limiting rights even though this showing might be unimpressive if submitted as justification for governmental restriction of personal communication among members of the general public." *Jones*, 433 U.S. at 133 n.9 (internal

quotation marks and ellipsis omitted). While prisoners certainly have the right to present their individual grievances to the powers that be, they have no right to effective collective action, for obvious reasons. *Id.* at 129, 132. We do not fault the prison officials here for attempting to "nip in the bud" the organized inmate action, especially as Griffin's access to the formal grievance process remained unimpeded. "Entreaties to [collective inmate action], like petitions protesting prison conditions, are not entitled to First Amendment protection where other less disruptive means of airing grievances are available." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (internal alteration and quotation marks omitted). *See also Jones*, 433 U.S. at 130 n.6 (noting the same principle).

On the facts of this case, second-guessing the prison administrators' conclusion that Griffin's letter posed some degree of security concern would contradict the maxim that "[t]he federal courts do not sit to supervise state prisons." *Meachum v. Fano*, 427 U.S. 215, 229 (1976). The record does not contain substantial evidence indicating that Berghuis' and Sutherby's invocation of security interests was a smokescreen to cover up impermissible retaliation or that their response to Griffin's conduct was otherwise unreasonable. *Bell*, 441 U.S. at 548. Because Griffin's letter was inconsistent with the prison's legitimate penological objectives, it was not protected by the First Amendment. *See Thaddeus-X*, 175 F.3d at 395. His retaliation claims therefore cannot survive defendants' motion for summary judgment.

2.

Even if Griffin's letter had been protected by the First Amendment, summary judgment would still be proper on his claims because Berghuis and Sutherby would be entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of

the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Such a right is clearly established only if "existing precedent . . . [has] placed the statutory or constitutional question beyond debate," such that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted). As a result, the doctrine of qualified immunity protects government officials from liability where they make "reasonable but mistaken judgments about open legal questions." *Id.* at 2085. "When properly applied," the doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

As has been explained, Berghuis and Sutherby reasonably responded to the potential security threats that they perceived in Griffin's correspondence. Even if in hind-sight their response can be viewed as an over-correction, "[t]he essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012).

Analysis of the second element of Griffin's retaliation claims against Berghuis and Sutherby—the "adverse action" prong—yields a similar result. As counsel for Griffin observes, whether Griffin's transfer and removal from the Warden's Forum were sufficiently "adverse" to support a retaliation claim is an unsettled question in Sixth Circuit jurisprudence. *See id.* at 509 (explaining that the legal question at issue must be defined at a "reasonably particularized" level of generality). Griffin's transfer may, in the final analysis, have been "an adverse action," given that an action is adverse as long as it "would deter a person of ordinary firmness from continuing to engage in [the protected] conduct." *Brown*, 312 F.3d at 789. But on the other hand, we have long recognized that, "since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-*

*El*, 412 F.3d at 701. *See also LaFountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013) ("As a general matter, a prison official's decision to transfer a prisoner from the general population of one prison to the general population of another is not considered adverse."). We see no reason to decide this question now, because the indeterminacy of pertinent authority on the issue means that neither Berghuis nor Sutherby reasonably could be expected to know that Griffin's transfer was sufficiently adverse to support a First Amendment retaliation claim. *See Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009) (observing that a case may be decided on qualified immunity grounds without first reaching the merits of the constitutional claim).

The same is true for Griffin's removal from the Warden's Forum. We have not been directed to any case holding that participation in a Warden's Forum is so valuable to a prisoner that its denial reasonably would deter the prisoner from engaging in protected conduct. As was true of Griffin's transfer, even if removal from the Forum could be deemed sufficiently adverse, Berghuis and Sutherby could have reasonably believed that it was not. As a result, even if their conduct could have formed the basis of a First Amendment retaliation claim, Berghuis and Sutherby were entitled to summary judgment on the basis of qualified immunity.

B.

Although the district court properly entered summary judgment on Griffin's claims against Berghuis and Sutherby, Griffin fares better on his claims against Officers Condon, Downard, and McMurtrie. The defendant officers concede that Griffin's participation in the ombudsman's investigation of Condon was protected conduct. They also concede that the false misconduct charge that McMurtrie leveled at Griffin is an adverse action. *See Brown*, 312 F.3d at 789. The parties' only dispute, therefore, is on the element of causality, and Griffin's argument on that issue is the clear winner.

"[T]he causation inquiry centers on the defendant's motive." *Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007). Because direct evidence of retaliatory intent is rare, circumstantial evidence may be "the only means of establishing the connection between a defendant's actions and the plaintiff's protected conduct." *King*, 680 F.3d at 695. A close "temporal proximity between protected conduct and retaliatory acts . . . creat[es] an inference of retaliatory motive." *Id.*; *see Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010).

Griffin is due such an inference here. If Griffin's evidence is to be believed, McMurtrie knowingly filed a false misconduct charge against him the day after agreeing with his fellow officers to file false charges against Griffin in retaliation for his efforts to "change" institutional practices. One of those officers—Condon—had previously warned Griffin that he would suffer for his attempt to "change" things by testifying in the investigation. This confluence of circumstances suggests that the false charge was filed against Griffin "at least in part" because of his protected conduct. *King*, 680 F.3d at 694.

Griffin's evidence, to be sure, does not all point the same direction. There is some suggestion, in fact, that the officers were partially motivated by Griffin's activities as a member of the Warden's Forum, rather than by his participation in the ombudsman's investigation. Still, the record evidence is that the conspiring officers were "tired of Griffin trying to change things." Particularly given the close temporal link and Condon's warning to Griffin that his testimony in the ombudsman's investigation would "not change a thing," the evidence supports a reasonable inference that the officers were motivated to file false misconduct charges against Griffin "at least in part" by his participation in the ombudsman's investigation, even if his activity on the Forum also contributed to their exasperation. *See Shreve*, 743 F.3d at 132. And because "a person who sets in motion an adverse action can be liable for retaliation for the reasonably

foreseeable consequences of his actions," Griffin's claims against each of the conspiring officers survive summary judgment. *King*, 680 F.3d at 695.

The defendant officers resist this conclusion. They are correct to assert that they are entitled to summary judgment if they can prove "by a preponderance of the evidence that [McMurtrie] would have taken the same action absent the protected conduct." *King*, 680 F.3d at 709. But McMurtrie claims that the misconduct charge that he filed against Griffin was only mistakenly erroneous, not intentionally false. In this respect, McMurtrie is fighting the facts: he claims that he did not tell Griffin not to report to work on the day in question, while Griffin says that he did. The officers cannot win summary judgment by arguing that their evidence is more believable than Griffin's. *Anderson*, 477 U.S. at 255.

Finally, the defendant officers assert that they are entitled to qualified immunity. Griffin claims that they waived such an argument by failing to make it below, but it makes no difference, because the officers are in any event incorrect. "It seems to us elementary that a prisoner retains a First Amendment right to respond to questions posed to him by a prison investigator." *Cornell v. Woods*, 69 F.3d 1383, 1390 (8th Cir. 1995). It was similarly clear at the time of the events here that a false misconduct charge was an adverse action. *See, e.g.*, *Thomas*, 481 F.3d at 441. It follows that, if Griffin's story is believed, each of the defendant officers should have known better. *al-Kidd*, 131 S. Ct. at 2083. Summary judgment was improperly entered on Griffin's claims against them, and the district court's judgment in this respect is reversed.

### III.

For these reasons, we affirm the district court's entry of summary judgment on Griffin's claims against Berghuis and Sutherby. We reverse the entry of summary judgment on Griffin's

claims against the remaining defendants and remand for further proceedings consistent with this

opinion.

**MERRITT, Circuit Judge, concurring in part and dissenting in part.** I agree with the majority's decision in Section II.B to reverse and remand on the prisoner's claim that the guards filed a false misconduct claim against him in retaliation for plaintiff's participation in the ombudsman investigation. I would also reverse and remand on plaintiff's first claim against Wardens Berghuis and Sutherby. The district court and this court have now disposed of the prisoner's § 1983 claim of retaliatory transfer on summary judgment. I think there is a material dispute of fact on this issue. The warden states that the prisoner was transferred to another Michigan prison facility because as the head of the "Warden's Forum" the prisoner was "organizing a protest movement" with other prisoners. But where is the proof? The prisoner denies any such behavior. The only thing the Warden cites is a letter the prisoner wrote to the Warden's superior at the central corrections office. The prison rules themselves provide that such letters may be written to "The Director or any other Central Office staff." P.D. 05.03.118 (effective 6/6/05. *See Siggers v. Campbell*, 652 F.3d 681, 685 (6th Cir. 2011).

I do not understand the explanation that this letter to Central Staff is *per se* unprotected from retaliation because it was written to the Warden's superior and did not follow the "chain of command." If the letter had been written to complain about being beaten by guards acting on instructions of the Warden or the prison's "deliberate indifference" to a broken leg or heart attack, surely the letter could not justify the Warden's immediate retaliation by transferring him. It would have been protected by the First Amendment and the Eighth Amendment, as well as his grievance rights under the Prison Litigation Reform Act, 42 U.S.C. § 1997. I would not shut off the prisoner's right to his day in court by summary judgment when there is a clear dispute of fact on a constitutional issue.