**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 18a0398n.06

Case No. 17-1931

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Aug 08, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RANDLE GRIFFIN, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| LOUIS CONDON; JOSEPH DOWNARD; | ) | THE EASTERN DISTRICT OF |
| GARY MCMURTRIE, | ) | MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE: MERRITT, SUTTON, and GRIFFIN, Circuit Judges.

PER CURIAM. Michigan held Randle Griffin as a prisoner at Gus Harrison Correctional Facility. An investigator from Michigan's Legislative Corrections Ombudsman's Office interviewed him as part of a prison abuse investigation. Later on, Griffin sued Officers Louis Condon, Joseph Downard, and Gary McMurtrie, claiming they harassed him for exercising his First Amendment right to speak to the ombudsman's investigator. A jury agreed with Griffin and awarded him $12,500 in damages. We affirm.

In September 2010, Griffin entered the Gus Harrison facility. His fellow inmates elected him to the Warden's Forum, and he took on a prison job as a recreation room porter.

In early 2011, an investigator from the Ombudsman's Office interviewed him as part of an investigation into prison guards and their treatment of inmates. Griffin said he had witnessed Officer Condon assault another inmate and falsely cite the inmate for misconduct.

On March 2, Griffin attended a Warden's Forum conference that caused him to be late to his job. He believed that it was prison policy to excuse that kind of tardiness. After work, Officer Condon summoned Griffin to his office for unrelated reasons. As he was leaving, Condon told him that his statement to the ombudsman's investigator would "come back to bite [him] in the ass." R. 129 at 16. Shortly thereafter, two fellow inmates heard Officers Condon, Downard, and McMurtrie discuss targeting Griffin with misconduct tickets because they were tired of his antics. That evening, Downard issued Griffin a ticket for missing work earlier in the day. The ticket said that Griffin "had no conflicting details, pass, etc. that would have kept him from checking in and/or working," which was not true because Griffin had been attending the Forum meeting. R. 75-3 at 2.

On March 3, Griffin tried to go to his prison job. Officer McMurtrie stopped him, informed him that he had lost his job because of the ticket, and said that he was confined to his cell for the day. Officer Downard later paid him a visit, called him a "rat," and threatened to beat him if he complained about the ticket. R. 129 at 24–25.

Griffin received another ticket the next day, this time from Officer McMurtrie. The reason: Griffin was not present for work the day before. McMurtrie issued the ticket even though he was the one who told Griffin he was fired and sent him back to his cell. A reviewing officer dismissed the ticket.

After all of this, the prison confined Griffin to his cell for a time, revoked his privileges for ten days, and fired him from his prison job. Griffin feared that the officers would return to beat him and that he would be branded an informant.

Griffin sued several Michigan Department of Corrections officers for retaliation. He argued that the officers violated the First (and Fourteenth) Amendment by retaliating against him for participating in the investigation. The district court granted summary judgment to the officers. We reversed the grant of summary judgment as to Officers Condon, Downard, and McMurtrie. *See Griffin v. Berghuis*, 563 F. App'x 411, 420–21 (6th Cir. 2014). The officers filed a second motion for summary judgment after discovery, which the district court denied. A jury found that the officers retaliated against Griffin for exercising his free-speech rights and awarded him $12,500. The district court denied the officers' motion for judgment as a matter of law or a new trial. The officers appeal.

To establish a cognizable claim of retaliation, Griffin had to prove that (1) he engaged in conduct protected by the First Amendment, (2) the officers took an "adverse action" against him that would deter a person of "ordinary firmness" from continuing to engage in the conduct, and (3) the protected conduct motivated the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

The officers first challenge the district court's interpretation of our summary judgment decision. They point out that the district court initially held as a matter of law that Officer Downard's ticket did not constitute adverse action and that our opinion reviewing that decision focused on the ticket issued by Officer McMurtrie. As they see it, that means we reversed only as to the McMurtrie ticket and left the rest of the district court's judgment intact.

3

We disagree. Our opinion described both tickets and both threats in detail. *Griffin*, 563 F. App'x at 414. And we reversed the district court's summary judgment decision regarding all "claims" against "each" of the "officers." *Id.* at 420–21.

The officers next claim that no clearly established law shows that a minor misconduct ticket may supply the basis for a free-speech retaliation claim. In one sense, they are correct. Qualified immunity insulates government officials from monetary liability if the alleged constitutional violation was not clearly established at the time of the incident. *See Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017). But our recent opinion in *Maben v. Thelen* explains why that argument falls short. The *Maben* court criticized another Michigan corrections officer for his "preoccupation" with the major/minor label affixed to a misconduct ticket. 887 F.3d 252, 270 (6th Cir. 2018). What mattered was the "action of retaliating by issuing a misconduct ticket and the penalties that come with being found guilty of misconduct." *Id.* To judge whether an action was severe enough to be adverse, we looked to the punishment the prisoner could have faced and the punishment he eventually suffered, not the label of the ticket. *Id.*; *see also Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004) ("[T]he mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation."). Relying on decisions issued during or before 2010, we found it clearly established that an officer has taken an adverse action if he retaliates with a misconduct ticket that carries the possibility of confinement, expulsion from group activities, or loss of privileges. *Maben*, 887 F.3d at 267–68, 270 (collecting cases). The same principle thus was clearly established in 2011, when Griffin received the tickets.

That principle allowed liability here. Griffin convinced a jury that Officers Condon, Downard, and McMurtrie used false misconduct tickets to retaliate against him for speaking to the ombudsman. *See King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) ("[A] person who sets in

motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions."). What matters is that each ticket could have resulted in five days' confinement and thirty days' loss of privileges, not what class of ticket the officers issued. In fact, the Downard ticket led to a period of cell restrictions for Griffin, the loss of his prison job (and salary), and the loss of other privileges. On top of all that, Officer Condon warned him that his statement to the investigator would "bite [him] in the ass," while Officer Downard publicly labeled him a "rat" and threatened to "beat [his] ass" and put him in solitary confinement if he complained any more. R. 129 at 16, 24. A threat counts as a prior restraint, the "quintessential first-amendment violation." *See Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)). These facts sufficed to permit the jury to find an adverse action.

Hoping to avoid this conclusion, the officers tack in a different direction: They maintain that Griffin never properly exhausted the prison's grievance procedures in compliance with the Prison Litigation Reform Act. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Even though Griffin appealed the rejection of his grievance through each required level, they point out that the prison rejected his grievance because he asserted "multiple issues." Appellants' Br. 45. So, say the officers, Griffin failed to exhaust his remedies when he failed to re-grieve each issue individually and appeal each one separately. *Id.*

But the argument creates a labyrinth out of a straightforward path. Griffin did not have to "go beyond what was specifically required by the . . . grievance procedure" to exhaust his administrative remedies. *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011). The officers point to no part of the directive that *required* Griffin to refile new grievances for each of the issues in the original grievance. If anything, the directive suggests (and Griffin understood it to mean) the

5

opposite; it says that a "new grievance shall not be filed regarding the rejection" of a grievance. R. 75-8 at 3.

Even if the policy had required Griffin to file new, separate grievances, the officers would lose anyway because the prison misapplied its own policy in addressing the original grievance. The relevant policy directive says that the prison can reject a grievance that raises "multiple unrelated issues," not multiple related issues. R. 75-8 at 3. Griffin's original grievance alleged that he suffered retaliation for exercising his First Amendment rights. He mentioned examples, including the officers' physical threats and false misconduct tickets, related to the central issue of the grievance: retaliation. When the prison rejected Griffin's multiple-related-issues grievance, it did not follow its own policy directive. And when Griffin appealed that mistaken rejection through each step of the administrative process, he exhausted his administrative remedies. *See Risher*, 639 F.3d at 240.

Last of all, the officers claim that the district court committed reversible error by allowing the Ombudsman's Report to be admitted on the ground that the report amounts to impermissible hearsay and is unduly prejudicial character evidence to boot. We disagree.

Rule 803(8) of the Federal Rules of Evidence excludes from the rule against hearsay a "record or statement of a public office" if it sets out "factual findings from a legally authorized investigation." Opinions or conclusions contained in the report count as factual findings. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169–70 (1988). The opposing party may convince the district court to exclude the report by showing that the author relied on a source of information or produced the report in circumstances that "indicate a lack of trustworthiness." Fed. R. Evid. 803(8). In assessing such challenges, courts look to factors like the timeliness of the investigation, the investigator's skill or experience, and any evidence of bias. *Beech Aircraft*, 488 U.S. at 167

n.11. Abuse-of-discretion review applies. *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997).

The Ombudsman's Office is a public office within the Michigan Legislative Council. Mich. Comp. Laws § 4.352. Michigan law authorizes the office to investigate and issue reports relating to complaints by inmates, among other issues. *Id.* §§ 4.354, 4.360(1). The office found that "the similarity and volume of the [prisoners'] complaints indicate their accuracy." R. 119-1 at 2. The report then described the allegations it found credible while leaving out many complaints that it found specious. Most importantly, the officers fail to show that the district court abused its discretion when it found the report trustworthy. The report was timely; the ombudsman issued the report in mid-February 2011, just before the alleged retaliation. The investigator who drafted the report was competent; she was an attorney serving as a senior analyst with the Ombudsman's Office and had over two years' experience on the job when she completed it. She started the investigation in 2009 and apparently spent two years on it. No one claims she was biased. True, the investigation did not include a hearing. But the officers did not ask for one and do not show how the absence of a hearing led to flaws in the report. To top it off, Griffin called the investigator to the stand. The officers' attorney cross-examined her at length. They had their chance to convince the jury that it should believe them rather than the investigator.

The officers suggest that the report does not fall under the public records exception because Michigan law bars the government from releasing it to the public. *See* Mich. Comp. Laws § 4.359. But the question turns on the public nature of the office that produced the report, not the public availability of the report. 2 McCormick on Evidence § 295 (7th ed. 2016).

The officers note that the report "contained hearsay" in the form of complaints that prisoners relayed to the investigator. Appellees' Br. 50. That's not quite right. True, the

Ombudsman's Office detailed dozens of complaints that prisoners made against prison staff. But the report did not simply list every complaint it received. It listed only those complaints that the investigators concluded were accurate based on the volume and similarity of the complaints. Such reasoned conclusions count as "factual findings" that are admissible under Rule 803(8). *See Beech Aircraft*, 488 U.S. at 169–70. And a "lack of personal knowledge is not a proper basis for exclusion of a report otherwise admissible under Rule 803(8)." *Alexander v. CareSource*, 576 F.3d 551, 562–63 (6th Cir. 2009); 2 McCormick on Evidence § 296.

The officers add that the district court should have excluded the report as impermissible evidence of past acts aimed at showing that the officers retaliated against Griffin. Fed. R. Evid. 404. But Evidence Rule 404(b)(2) allows past-act evidence introduced to prove a continuing plan or scheme. *See United States v. Passarella*, 788 F.2d 377, 384 (6th Cir. 1987). The report contains probative evidence casting light on a material issue: a continuing pattern by the officers to use harassment and tickets to keep prisoners quiet. *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003).

The officers seek shelter in the last harbor available: Evidence Rule 403. They claim that the report is more prejudicial than probative because it paints Gus Harrison as a facility staffed by "a bunch of racists who retaliated against prisoners by issuing false minor tickets." Appellants' Br. 58. But that harbor offers no safety. True, the report describes how other officials discriminated against inmates based on race, sexual orientation, and sex offender status. But the report does not attribute any of that conduct to the defendants. Officer Downard appears nowhere in the report. And while the report includes allegations against Officers Condon and McMurtrie, they do not go beyond the kinds of allegations against them already raised by Griffin. According to the report, Officer Condon generally harassed prisoners and once grabbed one by the wrist. For

his part, Officer McMurtrie generally harassed inmates and had a habit of using tickets to punish them. The report prejudices them no more than the other evidence already in the record. To the extent the defendants were concerned about findings in the report, e.g., racist acts, that did bear on this case, they should have asked the judge to remove those parts of the report from the document that went to the jury. So far as we can tell, they made no such request.

But even assuming the court erred in introducing the report on any of these grounds, any error was harmless. *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir. 1989). "We generally will not reverse even an erroneous evidentiary ruling if it merely resulted in the submission of redundant information to the jury." *In re Air Crash Disaster*, 86 F.3d 498, 535 (6th Cir. 1996). Griffin and Larry Anthony testified that prison staff regularly used threats, abuse, and misconduct tickets to retaliate against prisoners. Anthony described how he spoke up to the officers about their plan to punish Griffin with false misconduct tickets to say it was "kind of bogu[s]." R. 129 at 127. Their response? Shut up or face a misconduct ticket. Another witness, Terrance Davis, called the conduct of corrections officers at the facility "foul" and described how they overissued tickets. R. 130 at 14–17. No doubt the plaintiff's lawyer used the report in his closing argument. But it appears to have had little effect. In closing argument, the lawyer asked for $70,000 in punitive damages on top of whatever the jury thought would "justly compensate" Griffin. R. 131 at 91. But the jury awarded only $11,000 in punitive damages and $1,500 in compensatory damages. And one last point: It's very difficult on this record to see how the officers could have kept out the findings in the report, e.g., "[p]risoners are retaliated against for filing grievances" and "[o]fficers use minor tickets as weapons to keep many prisoners in constant sanctions," R. 119-1 at 2. Indeed, they aim very few of their appellate arguments at the introduction of that evidence into the record. Rather, their core complaints are about the various

statements made by the various inmates.  It's difficult to see the additional harmfulness from those

statements once those findings are before the jury.

We affirm.