RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RANDY BERKSHIRE (17-1993 & 17-2039),

*Plaintiff-Appellee*,

*v.*

> Nos. 17-1993/2039

DEBRA DAHL, DONNA BEAUVAIS, CHRISTOPHER SERMO, and MICHAEL NELSON (17-2039); VASILIS POZIOS (17-1993),

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-12038—Arthur J. Tarnow, District Judge.

Argued: May 1, 2019

Decided and Filed: June 28, 2019

Before: MERRITT, MOORE, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dale A. Robinson, RUTLEDGE, MANION, RABAUT, TERRY & THOMAS, P.C., Detroit, Michigan, for Appellant in 17-1993. Adam R. de Bear, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants in 17-2039. Conor T. Fitzpatrick, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellee. **ON BRIEF:** Dale A. Robinson, RUTLEDGE, MANION, RABAUT, TERRY & THOMAS, P.C., Detroit, Michigan, for Appellant in 17-1993. Adam R. de Bear, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants in 17-2039. Conor T. Fitzpatrick, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellee.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.   Randy Berkshire was formerly an inmate incarcerated at the Macomb Correctional Facility in Michigan.  There, he experienced a parade of horribles.  The question is whether those responsible violated Berkshire's clearly established constitutional rights.  Different facts and different law apply to each Defendant in this case.

Berkshire had mental-health issues, but he began to improve while he was in the Residential Treatment Program ("RTP") at the Macomb Facility.  In RTP, Berkshire worked as a Housing Unit Representative on a "Warden's Forum," in which he brought inmate complaints to the attention of prison staff.  After Berkshire brought one set of complaints, Dr. Debra Dahl unilaterally raised Berkshire's Global Assessment Functioning ("GAF") score, which mental-health professionals use to measure a patient's level of functioning, to a score that made Berkshire ineligible to stay in RTP.  Berkshire claims Dr. Dahl removed him from RTP to retaliate against Berkshire for his Warden's Forum complaints, thereby violating his First Amendment rights.

Once discharged from RTP, Berkshire's health and mental state quickly deteriorated. Three individuals oversaw Berkshire's care:  Donna Beauvais, the unit chief of the outpatient mental-health program; Christopher Sermo, a psychologist with the outpatient program; and Dr. Vasilis Pozios, a private doctor working for the government.  Berkshire had homicidal thoughts and engaged in self-injurious activity, including depriving himself of food and water. Eventually, Berkshire attempted to commit suicide.  Only then did Beauvais and Sermo transfer Berkshire to a Crisis Stabilization Program, because, according to an email, they "could not transfer [Berkshire] to Mars . . . ."  Berkshire claims that Beauvais, Sermo, and Dr. Pozios exhibited deliberate indifference to Berkshire's serious medical needs in violation of the Eighth Amendment.

Finally, after Berkshire attempted suicide, he was restrained.  Around midnight, Sergeant Michael Nelson entered Berkshire's cell, and Berkshire requested a bathroom break.  Sergeant

Nelson (now a lieutenant) told Berkshire to "hold it" and that he was going to "stay just like that until [his] mental illness goes away," and then left. Sergeant Nelson never returned, leaving Berkshire to lie in his own urine and feces for about six to seven hours. Berkshire's claim against Sergeant Nelson turns on the Eighth Amendment conditions-of-confinement standard.

The district court denied qualified immunity to all the Defendants. For the reasons that follow, we affirm.

## I. BACKGROUND

Berkshire has a history of mental-health issues going back to early childhood. *See* R. 183-4 (Clark Rep. at 2–3) (Page ID #2430–31). Berkshire's problems with the law started when he was just nine years old. *Id.* at 3 (Page ID #2431). Eventually, Berkshire was incarcerated for thirteen years (2001 to 2014) for second-degree home invasion, *id.* at 2 (Page ID #2430), and from 2011 to 2012, he was housed at the Macomb Correctional Facility in Michigan. The instant case involves five Defendants and their encounters with Berkshire at the Macomb Facility. The facts as to each will be addressed in turn.

## A. Dr. Dahl: Berkshire's Time in RTP and His Discharge from RTP

In July 2011, Berkshire entered RTP. RTP is an inpatient mental-health wing at the prison that offers programs in art and music therapy, weight lifting, and psychotherapy for inmates with needs like Berkshire. At the time, Berkshire was diagnosed with bipolar disorder, obsessive-compulsive disorder, and major depression.

In early March 2012, RTP residents elected Berkshire as their Housing Unit Representative. R. 183-2 (Berkshire Aff. at ¶¶ 25–26) (Page ID #2407). These representatives work on behalf of RTP residents, solicit residents' complaints and concerns, and share those complaints and concerns with the Resident Unit Manager. *See* R. 184-5 (Policy Directive) (Page ID #2616). A representative like Berkshire carries out their role by compiling resident input into an "Agenda" that is submitted to the unit manager prior to meetings between the representative and the unit manager and other staff. *Id.* Relatedly, representatives participate in the "Warden's

Forum," which "assist[s] the Warden in identifying and resolving problems which exist in the general population of the institution." *Id.*

As a representative, Berkshire made "rounds" with residents to discuss their concerns, which he would then compile into an Agenda. R. 183-2 (Berkshire Aff. at ¶¶ 27–28 (Page ID #2407). Moreover, in his role as representative, Berkshire assisted other inmates, "many of whom could not read or write, with drafting grievances." *Id.* at ¶ 29. On March 19, 2012, Berkshire submitted an Agenda to Dr. Dahl, the RTP unit chief, and the Resident Unit Manager, Geraldine Wilson. *Id.* at ¶ 35 (Page ID #2409); R. 183-10 (Agenda) (Page ID #2491). The Agenda contained six issues and requests and included citations to prison policies. R. 183-10 (Agenda) (Page ID #2491–93). Berkshire addressed the Agenda to Dr. Dahl, and he asserts that he delivered it to her personally. *Id.*; R. 183-2 (Berkshire Aff. at ¶¶ 36–37) (Page ID #2409). Over the course of the next two days, RTP staff refused to let Berkshire make his rounds, even though other representatives were able to do so. *See* R. 183-2 (Berkshire Aff. at ¶¶ 38–40) (Page ID #2409–10).

Then on March 21, 2012—two days after Berkshire submitted his Agenda—Dr. Dahl increased Berkshire's GAF score from 48 to 53. *See* R. 183-13 (Page ID #2500–02). (As mentioned above, the GAF is a measure used by mental-health professionals to indicate the level of functioning of a patient.) A GAF score of 51 makes an inmate ineligible for RTP. Consequently, Berkshire was transferred from RTP back into the general population on about March 23, 2012. Berkshire states that he "had not discussed [his] mental health situation with any of [his] treating doctors in months nor did [he] feel that [he] was ready to be placed in the general population of a prison." R. 183-2 (Berkshire Aff. at ¶ 41) (Page ID #2410); *see also* R. 183-4 (Clark Rep. at 7) (Page ID #2435) (noting a "three month lapse in documentation" between December 20, 2011, when Berkshire's GAF was 48, and March 21, 2012, when Dr. Dahl raised Berkshire's GAF to 53). For her part, Dr. Dahl could not recall meeting with Berkshire, creating the record, or the review of Berkshire. *See* R. 183-7 (Dahl Dep. at 65–66) (Page ID #2472–73). The record itself states that, "[s]ince being in the RTP, Mr. Berkshire has made good progress," and goes on to recount some of Berkshire's experiences in RTP. *See* R. 183-13 (Page ID #2501).

Ultimately, Berkshire was discharged from RTP. Any "good progress" that Berkshire had made during his time there declined quickly once he entered the general population.

**B.   Beauvais, Sermo, and Dr. Pozios: Berkshire's Decline After His Discharge From RTP, His Treatment, and Suicide Attempt**

Donna Beauvais, Christopher Sermo, and Dr. Pozios each had a hand in Berkshire's treatment after Berkshire's discharge from RTP. (Because Dr. Pozios forfeited his qualified-immunity defense below and because his appeal is squarely decided by binding Sixth Circuit precedent, we address the facts related to him only to the extent that those facts interrelate with those relevant to Beauvais's and Sermo's appeals.)

"Discharge from RTP was traumatic for Mr. Berkshire." R. 183-4 (Clark Rep. at 4) (Page ID #2432). Indeed, an April 1, 2012 medical record reveals that Berkshire was hospitalized due to an "abrup[t] stop[p]age of his medication, and he hadn't . . . eaten any food, drunk any water in 3 days . . . . When asked how he is doing, prisoner Berkshire stated 'doesn't matter'." R. 183-16 (Page ID #2522). The record also states that treatment was necessary to "reduce risk of [Berkshire] needing a more intensive level of care, reduce risk of harm to self or others, maintain or improve current level of functioning." *Id.* When Berkshire was asked whether he had attempted suicide in the past, he responded "many times." *Id.*

On March 26, 2012, three days after Berkshire was discharged from RTP, Beauvais met with Berkshire for about ten to fifteen minutes. Beauvais knew then that Berkshire was expressing homicidal thoughts. R. 212-2 (Beauvais Dep. at 61) (Page ID #4436). After this meeting, Beauvais testified that she "did not provide any treatment," but she assigned Berkshire "to a case manager and a psychiatrist." *Id.* at 67 (Page ID #4439). It is possible that Beauvais was referring to Sermo, who is a *psychologist*. Sermo indicated that Beauvais "was happy that she gave [Berkshire] to [him] . . . because [Berkshire] was presented to [him] as being problematic." R. 212-3 (Sermo Dep. at 65) (Page ID #4447). Within days after Berkshire's meeting with Beauvais, he stopped eating and drinking and abruptly stopped his medications, which triggered his hospitalization.

On April 3, 2012, Sermo visited Berkshire in his cell to evaluate him, allegedly for less than five minutes.  Berkshire stated that Sermo asked him "what [Berkshire] felt was best for [himself]."  R. 93 (Berkshire Aff. at ¶ 35) (Page ID #996).  Berkshire asked to be placed back into RTP, but Sermo responded that neither Berkshire's "diagnosis [n]or behaviors met the criteria" for RTP.  *Id.*  Berkshire then requested to be placed in a Crisis Stabilization Program, in which Berkshire could have received a psychiatric evaluation to determine appropriate treatment.  *Id.*  Berkshire asserts that Sermo stated "that he did not feel like doing all of that paperwork and ended the interview."  *Id.*; *cf.* 212-3 (Sermo Dep. at 66) (Page ID #4448) (Sermo admitting that Berkshire was a patient that caused him to do extra work).

Shortly after this meeting, Berkshire attended a hearing about a threatening behavior ticket he received (purportedly written by Beauvais), and Berkshire was placed in segregation.  R. 93 (Berkshire Aff. at ¶ 37) (Page ID #996); R. 183-17 (Page ID #2525).  Berkshire then went on another hunger strike and engaged in other self-injurious behavior.  This culminated in an April 9, 2012 attempt to hang himself with a noose in his cell.  *See* R. 93 (Berkshire Aff. at ¶¶ 38–47) (Page ID #996–97); R. 183-17 (Page ID #2525).  After that, Berkshire's GAF was promptly reduced to 19.  R. 183-17 (Page ID #2526).  The medical record corroborates the fact that Berkshire was refusing care at this time.  *Id.*; *see also* R. 183-4 (Clark Rep. at 8–9) (Page ID #2436–37) ("Given the severity of [Berkshire's] conditions paired with uncontrolled behavior a secondary method to administer medications should have been sought . . . . [Berkshire's] diagnosis of dissociative depression is marked by deferred ability to establish trust easily . . . or to self soothe with isolation practices.").  Berkshire's suicide attempt was unsuccessful.

Other evidence also suggests that Beauvais and Sermo knew of the severity of Berkshire's condition but deliberately declined to take action.  Another inmate, Brent Lang, met with Dr. Pozios in late-May or early-June 2012.  Lang's declaration states that Dr. Pozios "admitted that he, Donna Beauvais and Christopher Sermo knew that Randy Berkshire was suffering from a[n] MMD (Major Mental Disorder) and that he had engaged in suicidal behaviors over the course of two weeks."  R. 115 (Lang Decl. at ¶ 8) (Page ID #1478).  The declaration continues:  "Dr. Pozios stated that they waited weeks before they referred him to a Crisis Stabilization Program because they hoped that Randy Berkshire would have died."  *Id.* at

¶ 9.   But after the attempted hanging, Beauvais and Sermo did transfer Berkshire to a Crisis Stabilization Program.   On April 11, 2012, Beauvais emailed Dr. Pozios:   "Unfortunately, we could not transfer [Berkshire] to Mars so we had to send him to CSP."   R. 213-5 (Page ID #4562).  Dr. Pozios responded, "Great.  Why didn't you try the moon?  It's closer."  *Id.*

## C.  Sergeant Nelson: The Night of Berkshire's Attempted Suicide

Sergeant Nelson's appeal involves a shorter set of facts.   After Berkshire attempted to hang himself, prison staff first placed him in a four-point top-of-bed restraint.   In this position, Berkshire stated that he was "screaming and complaining that [he] was in severe physical pain." R. 115-1 (Berkshire Suppl. Aff. at ¶ 22) (Page ID #1615).   Prison staff then placed Berkshire in a five-point top-of-bed restraint.  *Id.*

Sergeant Nelson was on duty from 9:00 P.M. on April 9, 2012 to about 5:00 A.M. on April 10, 2012.   R. 212-6 (Nelson Dep. at 56) (Page ID #4466).   Sergeant Nelson entered Berkshire's cell around midnight to check on the restraints.  R. 115-1 (Berkshire Suppl. Aff. at ¶ 22) (Page ID #1615).   When Berkshire asked to use the restroom, Sergeant Nelson told him to "hold it" and that Berkshire was going to "stay just like that until [his] mental illness goes away." *Id.*   Sergeant Nelson did not return and left Berkshire laying in his own urine and feces for upwards of six to seven hours.   Additionally, Berkshire asserts that he was "noncombative," "not threatening," and "posed no danger to [him]self or others" at the time Sergeant Nelson entered his cell.  *Id.* at ¶ 24.   Berkshire asserts that around 1:30 or 2:00 A.M., he was screaming loudly and trying to get off the bed to use the restroom, but he was ignored.   He then "urinated and defecated on [him]self."  *Id.* at ¶ 25 (Page ID #1615–16).   At 7:00 A.M., another official finally entered his room, and Berkshire was cleaned around 9:00 A.M.  *See id.* at ¶¶ 27–29 (Page ID #1616).

## D.  Procedural History

Berkshire brought a suit under 42 U.S.C. § 1983, alleging violations of his First and Eighth Amendment rights.   The district court denied qualified immunity to Dr. Dahl, Beauvais, Sermo, and Sergeant Nelson (collectively, "State Defendants").  *See generally Berkshire v. Dahl*, No. 12-12038, 2017 WL 3276466 (E.D. Mich. Aug. 2, 2017).   In addition, Berkshire filed for

summary judgment against Dr. Dahl.  The district court granted Berkshire's motion, *see id.* at *3–8, but the district court issued no final judgment or Rule 54(b) certification as to Dr. Dahl, *see* FED. R. CIV. P. 54(b).  The district court did not address Dr. Pozios's argument for qualified immunity because Dr. Pozios did not raise the issue in his objections to the magistrate judge's report and recommendation.  *See Berkshire v. Dahl*, No. 12-12038, 2017 WL 9471684, at *19 (E.D. Mich. Mar. 3, 2017) (denying Dr. Pozios qualified immunity).  Prior to these rulings, the district court also struck late-added affidavits proffered by Dr. Dahl.  *See generally* R. 235 (Dist. Ct. Aff. Order) (striking one affidavit and two paragraphs from another).

## II.  JURISDICTION

### A.  State Defendants' Appeal

Before turning to the merits of this qualified-immunity appeal, we must first address our jurisdiction.  Berkshire previously filed a motion to dismiss the State Defendants' appeal for lack of jurisdiction.  The motion was held in abeyance for our consideration.

For this court to have jurisdiction over an appeal based on the denial of qualified immunity, a defendant must concede the facts in the light most favorable to Berkshire.  This concession is necessary because "it is well-established that an order denying qualified immunity to a public official is immediately appealable pursuant to the collateral order doctrine to the extent that a summary judgment order denies qualified immunity based on a pure issue of law." *See Bennett v. Krakowski*, 671 F.3d 553, 558–59 (6th Cir. 2011) (citations and internal quotation marks omitted); *Turner v. Scott*, 119 F.3d 425, 427 (6th Cir. 1997) ("A denial of qualified immunity that turns on evidentiary issues is not [immediately appealable].").

The State Defendants have made the appropriate concession, and consequently, we have jurisdiction over this appeal.  *See* State Appellants' Br. at 1.  The State Defendants further concede that "[i]n the event that this Court finds that Appellants have disputed Mr. Berkshire's versions of the facts, it can ignore those unintentional factual disputes . . . ." *See* State Appellants' Reply Br. at 3.  We take that approach.

**B.  Dr. Dahl's Appeal**

Dr. Dahl's appeal, meanwhile, raises separate and additional jurisdictional issues.  We have jurisdiction over the qualified-immunity issue, as we generally do.  *See Bennett*, 671 F.3d at 558–59.  We lack jurisdiction, however, over other aspects of her appeal.

Sometimes a "case presents a special situation, . . . in which the issues of liability and qualified immunity are so related to each other that we can dispose of them together under the doctrine of pendent appellate jurisdiction."  *Brennan v. Township of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996); *see also Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998) ("The doctrine of pendent appellate jurisdiction allows an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction.").  In this case, the district court granted Berkshire's summary-judgment motion against Dr. Dahl, *Berkshire*, 2017 WL 3276466, at \*3–8, and it struck certain late-added affidavits, R. 235 (Dist. Ct. Aff. Order), but the district court did not enter a final judgment.  Further, the district court did not issue any Rule 54(b) certification.  *See* FED. R. CIV. P. 54(b) ("when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, . . . parties only if the court expressly determines that there is no just reason for delay.").  The lone appealable issue, therefore, is qualified immunity.  The question becomes whether pendent appellate jurisdiction applies to the other issues.

We do not have jurisdiction over the non-appealable issues here because, as we will explain, Dr. Dahl is not entitled to qualified immunity.  If Dr. Dahl is not entitled to qualified immunity, then "the appealable issue at hand" *can*, in fact, "be resolved without addressing the non-appealable collateral issue[s]" (i.e., partial summary judgment and the district court striking affidavits).  *See Chambers*, 145 F.3d at 797 (citation omitted).  First, even if the district court erred in granting summary judgment against Dr. Dahl, that issue is irrelevant to Dr. Dahl's motion for summary judgment against Berkshire.  Importantly, *Berkshire* was the non-moving party for Dr. Dahl's motion for summary judgment based on qualified immunity.  For Dr. Dahl's qualified immunity, we must view all facts and related inferences in the light most favorable to Berkshire.  If, on the other hand, we held that Dr. Dahl should have received qualified immunity,

then we could reverse the district court's grant of summary judgment for Berkshire (and the affidavit issue would become moot).  That is not the scenario we are in.  Second, the State Defendants acknowledge that there are no cases in which "a court of appeals has jurisdiction over an interlocutory appeal of a district court's order striking an affidavit."  *See* State Appellants' Reply Br. at 4.  The stricken affidavits are also irrelevant to Dr. Dahl's assertion of qualified immunity because again, for Dr. Dahl's summary-judgment motion, we view all facts and related inferences in the light most favorable to Berkshire.

## III.  QUALIFIED IMMUNITY

We now turn to whether each Defendant should receive qualified immunity.  "In civil suits for money damages, government officials acting in their official capacity are entitled to qualified immunity for discretionary acts which do not violate clearly established law of which a reasonable person would have known."  *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001).  This determination involves a two-part analysis, and courts have discretion to choose which part to address first.  *See Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016).  A plaintiff must demonstrate:  (1) that the facts, in the light most favorable to the plaintiff, show that a government official violated a constitutional right; and (2) that the right was clearly established at the time of the violation.  *See id.*

In an appeal from a district court's decision denying qualified immunity, "[w]e conduct de novo review because the issue whether qualified immunity is applicable to an official's actions is a question of law."  *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

## A.  Dr. Pozios

Dr. Pozios forfeited his qualified-immunity defense below.  Although Dr. Pozios asserted qualified immunity in his motion for summary judgment, R. 200 (Pozios Mot. for Summ. J. at 32–35) (Page ID #3834–37), he failed to raise an objection to the magistrate judge's report and recommendation that denied qualified immunity, R. 243 (Pozios Objections).  Consequently, the district court did not address the issue.  We have long held that, when a defendant does "not raise [an] argument in his objections to the magistrate's report and recommendation . . . [he] has [forfeited] his right to raise this issue on appeal."  *Kensu v. Haigh*, 87 F.3d 172, 176 (6th Cir.

1996) (citing *Thomas v. Arn*, 474 U.S. 140 (1985)); *see also Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *Kelly v. Withrow*, 25 F.3d 363, 366 (6th Cir. 1994).

We clarify that forfeiture, rather than waiver, is the relevant term here. Although our cases often use the terms interchangeably, "[w]aiver is different from forfeiture." *United States v. Olano*, 507 U.S. 725, 733 (1993). Waiver is affirmative and intentional, whereas forfeiture is a more passive "failure to make the timely assertion of a right . . . ." *Id.*; *see also United States v. White*, 920 F.3d 1109, 1122–23 n.4 (6th Cir. 2019) (Clay, J., concurring in part and dissenting in part) (explaining that "a defendant *waives* an argument by, for instance, withdrawing a motion or objection, stating that a proposition is not disputed, or stating that they are not pressing an argument," whereas "a defendant *forfeits* an argument by, for instance, failing to make it before the district court, failing to make it in its opening appellate brief, or identifying it without pressing it") (collecting cases); *Lucaj v. Fed. Bureau of Investigation*, 852 F.3d 541, 547–48 n.4 (6th Cir. 2017). While *Thomas v. Arn* held that "the failure to file objections to the magistrate's report *waives* the right to appeal the district court's judgment," 474 U.S. at 142 (emphasis added), *Arn* preceded the *Olano* Court's clarification. *See also Freytag v. Comm'r*, 501 U.S. 868, 894 n.2 (1991) (Scalia, J., concurring) (noting that the Supreme Court's cases also "often used [waiver and forefeiture] interchangeably," but that "[t]he two are really not the same . . . ."). Nowhere in his briefs or the proceedings below did Dr. Pozios affirmatively abandon his qualified-immunity defense. *See Lucaj*, 852 F.3d at 547–48 n.4. Rather, he simply *failed to file* an objection to the magistrate judge's R & R denying qualified immunity. That is forfeiture, not waiver.

The difference can sometimes be important because forfeited issues may in certain circumstances be considered on appeal. *See Harris v. Klare*, 902 F.3d 630, 635–36 (6th Cir. 2018) ("'Ordinarily an appellate court does not give consideration to issues not raised below.' . . . This rule is not absolute, however, and it is within the ambit of our discretion to entertain questions not raised below." (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941))). Even cases that have labeled a party's failure to object to a magistrate judge's R & R as "waiver" have nonetheless acted as though the issue was forfeited by addressing the otherwise "waived" issue on merits. *See, e.g.*, *United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019);

*Keeling*, 673 F.3d at 458; *see also Arn*, 474 U.S. at 155 (using the term "forfeiture" and then describing its rule as "a nonjurisdictional waiver provision, [which] the Court of Appeals may excuse . . . in the interests of justice."). Again, we do that in the *forfeiture* context.

Even had Dr. Pozios not forfeited qualified immunity, we are bound by our prior decision in *McCullum v. Tepe*, 693 F.3d 696, 697, 704 (6th Cir. 2012) (holding that a private doctor working for the government is not entitled to qualified immunity). *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). As Dr. Pozios himself concedes, *McCullum* squarely decides the issue presented by his appeal.

**B. Dr. Dahl: First Amendment Retaliation**

To establish a claim of First Amendment retaliation, a plaintiff shows that: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct." *King v. Zamiara* ("*King II*"), 680 F.3d 686, 694 (6th Cir. 2012) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The crux of this dispute is the first prong—that is, whether Berkshire engaged in conduct protected by the First Amendment.

In the first iteration of *King v. Zamiara* ("*King I*"), we held that the plaintiff's assistance to other inmates in his role *as a Warden's Forum representative* was protected conduct. *See* 150 F. App'x 485, 492 (6th Cir. 2005). *King I* reached that result through a straightforward application of *Thaddeus-X*. *See id.* at 492–93. Specifically, we concluded that the plaintiff "offered evidence that his assistance was necessary for other inmates to access the courts . . . ." *Id.* at 492. In reaching this conclusion, we relied first on the fact that the plaintiff was elected as a housing representative on the Warden's Forum and, therefore, the plaintiff was the person other inmates should contact about certain issues. *Id.* In addition, we noted that the plaintiff produced evidence that other inmates were either illiterate in English or "uneducated in the law and that they would have been unable to seek effective redress without [the plaintiff's] help." *Id.* at 492–93.

The question in this case then becomes whether Berkshire has enough evidence to show that his assistance to other inmates was necessary. Based on *King I*, Berkshire serving as the Warden's Forum representative counts as evidence. And as in *King I*, prison officials directed other inmates to Berkshire for help with complaints. *See* R. 183-6 (Berkshire Dep. at 145–46) (Page ID #2451–52) (Berkshire stating that this was "a common practice. Any issues that a prisoner ha[s] . . . to that nature[,] [prison personnel] always direct [other inmates] to see the housing unit representative."). That, of course, is precisely what Berkshire was elected to do. Berkshire further testified that those he helped "were either severely mentally ill, they couldn't read or write, or . . . they were too medicated to even . . . write anything down." *Id.* at 145 (Page ID #2451); *see also* R. 183-2 (Berkshire Aff. Exs. 1 & 2) (Page ID #2412–17) (inmate grievances that Berkshire helped prepare). Therefore, Berkshire has come forward with enough evidence to show that his assistance to other inmates in his role as a Warden's Forum representative was necessary. *See King I*, 150 F. App'x at 492–93; *Thaddeus-X*, 175 F.3d at 395–96. Berkshire "was not a jailhouse lawyer merely 'hanging a shingle' with hopes of attracting business; he was the appointed representative to whom the officials told other inmates to turn for the resolution of grievances." *See King I*, 150 F. App'x at 492.

Whether this claim is analyzed under the Petition Clause, as Berkshire's counsel at times has suggested, or under the Speech Clause makes little difference.[1] *See, e.g.*, *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir. 1997) ("A cause of action for violation of the Petition Clause is subject to the same analysis applied to a claim arising under the Speech Clause.") (collecting cases). Berkshire cites *Wolfel v. Bates*, 707 F.2d 932 (6th Cir. 1983) for the proposition that a prison must show that the Agenda (which summarized inmates' complaints and concerns) "imperiled legitimate penological objectives in order for the [Agenda] to lose its protected status." *See* Appellee's Br. at 24. In *Wolfel*, the plaintiff "drafted a petition alleging that prison guards were harassing the inmates of the Southern Ohio Correctional Facility by starting showers and 'walklines' between 5:30 and 6:00 a.m. Wolfel obtained signatures from seventeen fellow inmates and sent the petition to the prison superintendent." 707 F.2d at 933. In

---

[1]There has been some debate about whether this is a speech case or a petition case. We note that the operative complaint states: "Defendant Dahl's actions violated Plaintiff's rights for the retaliation of protected speech grounded in the First Amendment." *See* R. 101 (Am. Compl. at ¶ 28) (Page ID #1197).

response, a guard issued a misconduct ticket against the plaintiff, and the plaintiff was found guilty and issued a reprimand on his record. *See id.* We held that, without a finding that the petition was false or that the statements in the petition were maliciously communicated, the plaintiff was "subject[] to discipline merely because he complained. This was an impermissible abridgement of his right to seek redress of grievances." *Id.* at 934.

*Wolfel* is instructive and provides further force for Berkshire's case, but it was decided before *Thaddeus-X*. We need not probe too deeply how *Wolfel* interacts with the *Thaddeus-X* line of cases because *King I* (applying *Thaddeus-X*) is directly on point for Berkshire. Nonetheless, we observe that in *Griffin v. Berghuis* a panel of the court stated in dicta that reliance on the Petition Clause was "problematic . . . [because] [m]embers of the Warden's Forum are explicitly barred from using the Forum as a substitute for the formal [individual] grievance process." 563 F. App'x 411, 415 (6th Cir. 2014). *Griffin* continued: "it is clearly improper for a prisoner to be 'subjected to discipline merely because he complained' about his treatment by prison officials . . . ." *Id.* at 416 (quoting *Wolfel*, 707 F.2d at 934). Ultimately, *Griffin* rested on the following legal test: the Warden's Forum letter at issue, though speech, "is unprotected if its prohibition by prison officials is 'reasonably related to legitimate penological interests.'" *Id.* at 415 (first quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987); then citing *Thaddeus-X*, 175 F.3d at 395). The plaintiff's letter in *Griffin* flunked the test not because it was a Warden's Forum letter, but because it "posed a threat to prison security and consequently interfered with the prison's legitimate penological objectives." *See id.* at 416–17; *see also id.* at 412. Here Berkshire's letter is like that in *Wolfel* (a peaceful list of complaints), not *Griffin* (a threat of organized protest). Berkshire's speech was therefore "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *See Pell v. Procunier*, 417 U.S. 817, 822 (1974).

Dr. Dahl relies on previous statements in two unpublished orders by this court that a plaintiff "ha[d] not established that he was engaging in protected First Amendment activity as a warden's forum representative." *See Cromer v. Dominguez,* 103 F. App'x 570, 573, 2004 WL 1447648, at *2 (6th Cir. 2004) (unpublished order); *VanDiver v. Martin*, 48 F. App'x 517, 519–20, 2002 WL 31166925, at *2 (6th Cir. 2002) (unpublished order). These statements were made

in a particular context—an analysis, pursuant to *Thaddeus-X*, of whether the plaintiff's assistance was necessary to help other inmates. In *Cromer* and *VanDiver*, the answer was no; the plaintiff in *King I*, however, met the standard.

In *VanDiver*, we relied on the fact that the plaintiff "ha[d] not demonstrated that the inmates he represented on the warden's forum could not have been represented by another inmate, or that they could not bring any concerns they may have to the attention of prison officials without [the plaintiff's] assistance." *See VanDiver*, 48 F. App'x at 519. To be sure, "an inmate does not have an independent right to help other prisoners with their legal claims. Rather, a 'jailhouse lawyer's' right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts." *Thaddeus-X*, 175 F.3d at 395 (citation omitted). Accordingly, "only if [a plaintiff's] assistance is necessary to vindicate [a fellow inmate's] right of access to the courts can [a plaintiff] . . . state a claim of retaliation." *Id.*

*Cromer* followed a similar analysis. *See* 103 F. App'x at 573 (citing *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)). In *Herron*, the case *VanDiver* relied on, we explained that one inmate assisting another "is protected . . . when the inmate receiving the assistance would otherwise be unable to pursue legal redress." *Herron*, 203 F.3d at 415. Using *Thaddeus-X* as an example, we noted that this test could be satisfied in cases in which "the complainant had no knowledge of the law, was being held in administrative segregation, and could only access legal books by requesting them by title." *Id.* at 416. Taken together, the *Cromer* and *VanDiver* plaintiffs' First Amendment claims failed *not* because Warden's Forum-related activity is not protected per se; rather, the plaintiffs' claims failed because they had not shown that other inmates (whom the plaintiffs assisted) had no other reasonable alternatives for assistance. That is, the plaintiffs failed to satisfy the standards set out in cases like *Thaddeus-X* and *Herron*. By contrast, Berkshire satisfies this standard and, therefore, engaged in protected conduct.

Dr. Dahl counters that Berkshire violated prison regulations when he submitted the Agenda because it contained an "individual" complaint. *See* R. 184-5 (Policy Directive) (Page ID #2616) ("Housing unit representatives shall not use their position to present individual complaints to the administration."); *see also Thaddeus-X*, 175 F.3d at 395 ("[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot

proceed beyond step one."). Simply put, this counterargument is unpersuasive. The purported "individual" complaint reads: "Sergeant Haggerty doesn't want me to conduct any further rounds on A-Wing. His actions prohibit me from identifying and resolving problems which exist in the unit . . . ." R. 183-10 (Agenda at 2) (Page ID #2492). This complaint, though "individualized" in a *very* technical sense, relates directly to Berkshire's role as a representative and his ability to serve as a resource *for other inmates* to voice *their* complaints and concerns—which Berkshire was appointed to do. *See King I*, 150 F. App'x at 492. In short, Dr. Dahl slices the record too thin.

Moving to the second and third elements of Berkshire's retaliation claim, he also has enough evidence to overcome a qualified-immunity defense. Viewed in the light most favorable to Berkshire, two days after Berkshire submitted his agenda Dr. Dahl unilaterally changed his GAF score from 48 to 53. *See* R. 183-13 (Page ID #2500–02). Consequently, Berkshire was discharged back to the general population. We have held that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse." *See Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010); *see also id.* at 474–75 (explaining that a transfer to general population "can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner.").

Furthermore, Berkshire's expert, Dr. Karen Clark, noted that "[t]here is a three month lapse in documentation" between December 20, 2011, when Berkshire's GAF was 48, and March 21, 2012, when Berkshire's GAF was 53. R. 183-4 (Clark Rep. at 7) (Page ID #2435). Dr. Clark also noted that "[t]here is no mention of a supporting assessment completed." *Id.* at 6 (Page ID #2434). Dr. Clark stated that "[d]ischarge from RTP was traumatic for Mr. Berkshire." *Id.* at 4 (Page ID #2432). Dr. Dahl, for her own part, could not recall meeting with Berkshire, creating the medical record that raised Berkshire's GAF score, or the review of Berkshire, even after reviewing the document. *See* R. 183-7 (Dahl Dep. at 65–66) (Page ID #2472–73). To the extent that Dr. Dahl contests this evidence for purposes of qualified immunity, we view the evidence in the light most favorable to Berkshire and "ignore those unintentional factual disputes . . . ." *See* State Appellants' Reply Br. at 3. In sum, given the temporal proximity between Berkshire's submitting the Agenda and Dr. Dahl's unilateral changing of the GAF score,

alongside Dr. Dahl's inability to recall why the score was changed and the general absence of other documentation, Berkshire rounds out his retaliation claim. *See Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) ("[T]emporal proximity alone may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004))); *Thaddeus-X*, 175 F.3d at 399 ("Circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate."); *see also* R. 183-2 (Berkshire Aff. at ¶¶ 38–40) (Page ID #2409–10) (RTP staff refused to let Berkshire make his rounds after he submitted his Agenda, but other representatives were able to do so).

Finally, *King I* and *Thaddeus-X* were decided before the events in question here, and the law that those cases announced was therefore clearly established. Like *King I*, this case is a straightforward application of that well-established standard, and Berkshire has more than enough evidence to meet it. Berkshire thus engaged in protected activity, and he has more than enough evidence to round out his retaliation claim for the purpose of overcoming Dr. Dahl's qualified-immunity defense.

## C.  Beauvais & Sermo: Eighth Amendment Deliberate Indifference to a Serious Medical Need

"The Eighth Amendment, which applies against the States by virtue of the Fourteenth Amendment, provides:  'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'" *Harmelin v. Michigan*, 501 U.S. 957, 962 (1991) (citing *Robinson v. California*, 370 U.S. 660 (1962)); U.S. Const. amend. VIII. The Eighth Amendment thus forbids the "unnecessary and wanton infliction of pain . . . ." *See Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks omitted). More specifically for Berkshire's claim against Beauvais and Sermo, the Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A claim based on deliberate indifference to a serious medical need has an objective and a subjective prong. *See id.*

The "subjective component must be addressed for each [defendant] individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

To satisfy the objective prong, a plaintiff must show that he has "a sufficiently serious medical need." *See Blackmore*, 390 F.3d at 895 (internal quotation marks omitted). Beauvais and Sermo concede that Berkshire satisfies the objective component in that Berkshire had a serious medical need. *See* State Appellants' Br. at 35. Namely, Berkshire has issues with depression, psychotic disorders, and relatedly, suicidal tendencies.

"To satisfy the subjective component, an inmate must show that prison officials had 'a sufficiently culpable state of mind.'" *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). We have explained:

> [T]hat state of mind is one of deliberate indifference to inmate health or safety. Although the deliberate indifference standard describes a state of mind more blameworthy than negligence, this standard is satisfied if the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* (citations and internal quotation marks omitted).

Beauvais and Sermo (as well as Dr. Pozios) oversaw Berkshire's treatment after he was discharged from RTP on March 23, 2012. Berkshire points to evidence that suggests Beauvais and Sermo knew that Berkshire suffered from a "Major Mental Disorder[] and that [Berkshire] had engaged in suicidal behaviors over the course of two weeks from March 26, 2012 to April 10, 2012." R. 115 (Lang Decl. at ¶ 8) (Page ID #1478). Dr. Pozios apparently told inmate Brent Lang that he, Beauvais, and Sermo "waited weeks before they referred [Berkshire] to a Crisis Stabilization Program because they hoped that Randy Berkshire would have died." *See id.* at ¶ 9. At least by March 26, 2012, Beauvais knew that Berkshire "was expressing homicidal ideation." *See* R. 212-2 (Beauvais Dep. at 61) (Page ID #4436). During this time, in which Berkshire engaged in various self-injurious behaviors, Sermo met with Berkshire for about five minutes, and Sermo denied Berkshire's request to go into a Crisis Stabilization Program apparently because Sermo "did not feel like doing all of that paperwork . . . ." *See* R. 93 (Berkshire Aff. at ¶¶ 34–36) (Page ID #996); *cf.* R. 212-3 (Sermo Dep. at 65–66) (Page ID #4447–48) (Sermo

stating that Berkshire "was presented to [him by Beauvais] as being problematic," and admitting that Berkshire was a patient that caused Sermo to do extra work). In the Crisis Stabilization Program, Berkshire would have received "a thorough psychiatric evaluation to determine [his] appropriate treatment." *See* R. 93 (Berkshire Aff. at ¶ 35) (Page ID #996). On April 9, 2012, after days of Berkshire depriving himself of food and water, he attempted to hang himself. Only then was Berkshire transferred to the Crisis Stabilization Program. On April 11, 2012, Beauvais emailed Dr. Pozios: "Unfortunately, we could not transfer [Berkshire] to Mars so we had to send him to CSP." R. 213-5 (Page ID #4562). Dr. Clark stated in her report that "[t]here is written evidence that Mr. Berkshire was medically deprived at a time when his behavior was observably worse and his need for efficient and appropriate intervention heightened." R. 183-4 (Clark Rep. at 8) (Page ID #2436).

The evidence in this case shows that, at least at summary judgment, Berkshire meets the high bar that a plaintiff must clear on an Eighth Amendment medical-needs claim. Although true that courts generally do not second guess the judgment of prison medical officials, we have also recognized:

> [P]rison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment. Indeed, deliberate indifference may be established in cases where it can be shown that a defendant rendered "grossly inadequate care" or made a "decision to take an easier but less efficacious course of treatment."

*Jones v. Muskegon County*, 625 F.3d 935, 944–45 (6th Cir. 2010) (citations omitted). The evidence surveyed above shows that both Beauvais and Sermo, despite knowing that Berkshire was suicidal, "rendered 'grossly inadequate care.'" *See id.* at 944 (citations omitted). The expert report, Berkshire affidavit and Lang declaration, deposition testimony, and the email all provide more than ample support for the inference that Beauvais and Sermo knew of and were deliberately indifferent toward a potential risk of suicide.

"This circuit has consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known." *Comstock*, 273 F.3d at 711 (collecting cases). Viewed in the light most favorable to Berkshire, Beauvais's and Sermo's approach was not merely "wait and see if Berkshire gets better," but rather, they took a

"medically deprive and hope the problem goes away" approach.**²** To the extent that these two Defendants contest this evidence, at this stage we do not have jurisdiction to address factual disputes. *See* State Appellants' Reply Br. at 3. As one example, Beauvais asserts that she did not actively participate in Berkshire's care other than at the March 26, 2012 meeting, yet Sermo testified that Beauvais participated in Berkshire's weekly treatment reviews. *See* R. 212-3 (Sermo Dep. at 68) (Page ID #4449). At this point, Berkshire's evidence is sufficient to establish that Beauvais and Sermo knew that Berkshire was suicidal, these suicidal and homicidal tendencies were communicated to them, and Beauvais and Sermo purposefully declined to send Berkshire to the Crisis Stabilization Program (until he actually attempted suicide), knowing that Berkshire was at a significant risk of attempting suicide. Taken together, these facts satisfy the deliberate-indifference standard at the summary-judgment stage. *See Jones*, 625 F.3d at 945 (collecting cases).

Berkshire had a clearly established right to have his suicidal tendencies attended to, and evidence supports the inference that Beauvais and Sermo acted with deliberate indifference toward Berkshire's medical needs. Beauvais and Sermo are therefore not entitled to qualified immunity.

**D. Sergeant Nelson: Eighth Amendment Conditions of Confinement**

Berkshire's claim against Sergeant Nelson entails a different Eighth Amendment analysis, one based on Berkshire's conditions of confinement. This claim also has an objective and subjective prong. *See Spencer v. Bouchard*, 449 F.3d 721, 728 (6th Cir. 2006). For a conditions-of-confinement claim, the objective prong can be satisfied when "a prison official's act or omission . . . result[s] in the denial of 'the minimal civilized measures of life's necessities.'" *See Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The subjective prong "requires a finding of deliberate indifference, that is, 'that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *See Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 842)).

---

**²***See, e.g.*, R. 183-4 (Clark Rep. at 8) (Page ID #2437); R. 93 (Berkshire Aff. at ¶¶ 34–36) (Page ID #996); R. 213-5 (Page ID #4562); R. 212-3 (Sermo Dep. at 65–66) (Page ID #4447–48); R. 115 (Lang. Aff. at ¶ 9) (Page ID #1478).

"We have held that there is a substantial risk of serious harm 'in the denial of the minimal civilized measure of life's necessities . . . .'" *Id.* (quoting *Spencer*, 449 F.3d at 728)).  And "[a]n official's knowledge of the risk may be demonstrated through circumstantial evidence and inference, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (internal quotation marks omitted).  Unlike his codefendants, Sergeant Nelson makes no concessions.

Based on *Hope v. Pelzer*, 536 U.S. 730 (2002), and *Barker v. Goodrich*, Sergeant Nelson is not entitled to qualified immunity at the summary-judgment stage.  In *Hope*, the Supreme Court held that "the Eighth Amendment violation is obvious" when an inmate was handcuffed in a restrictive position for seven hours in the sun without access to water or bathroom breaks.  *See* 536 U.S. at 738.  In so holding, the Supreme Court explained that "[a]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Id.* at 737 (internal quotation marks omitted) (alteration in original).

Then in *Barker*, we relied on *Hope* and similar cases to hold that the defendants in that case "had fair warning in 2007 that their conduct was unconstitutional." *Barker*, 649 F.3d at 435; *see also id.* at 434 ("[F]or no legitimate penological purpose, [plaintiff] was denied adequate access to water and a restroom, and forced to maintain an uncomfortable position for an extended period of time [i.e., twelve hours], subjecting him to a significant risk of wrist and arm problems, dehydration and thirst, and pain and damage to the bladder.  This constitutes a denial of the minimal civilized measures of life's necessities.").  The *Barker* court continued:

> Case law from the Supreme Court, this Court, and other circuits established at that time that *each condition* seen here—restraining an inmate in an uncomfortable position, denying access to water, and denying access to the toilet—could rise to an Eighth Amendment violation if allowed to persist for an extended period.

*Id.* at 435 (emphasis added).  Notably, we viewed seven hours (the length of time in *Hope*) as an "extended period." *See id.* at 435–36.  The *Barker* court further reasoned that "our sister circuits have found shorter deprivations to violate the Constitution when they lack a penological purpose." *Id.* at 436 (collecting cases).  Accordingly, we adopted the reasoning of *Hope* and other circuits that addressed "shorter deprivations" and concluded that the case law was "thus sufficient to give the Defendants fair warning." *Id.*

Soo too for Sergeant Nelson.  The differences between *Hope*, *Barker*, and the cases surveyed therein are immaterial and do not overcome the fact that Sergeant Nelson denied Berkshire a bathroom break and then left Berkshire to lay in his own urine and feces for several hours.  Sergeant Nelson had fair warning that this conduct, if without a penological purpose, constitutes a denial of life's necessities, subjects Berkshire to a significant risk of pain and damage to the bladder (as well as humiliation), and therefore could rise to the level of an Eighth Amendment violation.  *See Hope*, 536 U.S. at 738 & n.8; *Barker*, 649 F.3d at 434.  The district court correctly concluded "that there is a material question of fact whether [Sergeant Nelson's] actions were taken for a legitimate penological reason . . . ."  *See Berkshire*, 2017 WL 3276466, at *14.

Sergeant Nelson's arguments to the contrary are not persuasive.  He hangs his hat on the fact that he denied Berkshire the ability to use the restroom on only one occasion and that this court has previously stated "that deprivations of fresh water and access to the toilet for a 20–hour period, while harsh, were not cruel and unusual punishment."  *See Hartsfield v. Vidor*, 199 F.3d 305, 310 (6th Cir. 1999) (citing *Stephens v. Carter Cty. Jail*, 1987 WL 36997, at *1 (6th Cir. 1987) (unpublished table decision)).  First, *Stephens* is a non-binding and unpublished order, and it is distinguishable.  The plaintiff there was confined in a holding cell in a county jail for twenty hours and he did, in fact, use the bathroom upon release.  *Stephens*, 1987 WL 36997, at *1.  Moreover, the court stated that "in light of plaintiff's recent assault on the deputy sheriff, the defendants were vested with very broad discretion in adopting policies and procedures which were needed to preserve internal order and security."  *Id.*  Second, *Hartsfield* is also distinguishable because, as the court noted, "the record provides [unrefuted] sworn testimony and documentation . . . that adequate toilet breaks and opportunities to drink were provided to plaintiff while he was in restraints and that he took advantage of them at least once . . . ." *Hartsfield*, 199 F.3d at 310.  That is not the case here.  Third and relatedly, as the district court reasoned, the court should not fault Berkshire for requesting to use the restroom only once when he had only one opportunity to do so.  *See Berkshire*, 2017 WL 3276466, at *14.  Sergeant Nelson entered Berkshire's cell around midnight, denied Berkshire a toilet break, and then this denial effectively continued for approximately six to seven hours because Sergeant Nelson never returned.  In fact, no one returned until approximately 7:00 A.M.  *See id.*

Accordingly, Berkshire has produced sufficient evidence to show a violation of a clearly established constitutional right, and he can survive Sergeant Nelson's assertion of qualified immunity.

## IV. CONCLUSION

For these reasons, we **AFFIRM** the district court, and we **DISMISS** the remainder of Dr. Dahl's appeal for lack of jurisdiction.